## THE BALTIMORE COUNTY WATER AND ELECTRIC COMPANY vs. CARRIE V. DUBREUIL, ET AL. THE SAME vs. DOUGLAS H. GORDON.

*When the Laying of Water Pipes in a Country Road is an Additional Servitude.*

The condemnation or dedication of land for use as a street or highway in a city or town, or in close proximity thereto, carries with it the right to use the highway for the laying of gas and water pipes, since that is one of the purposes for which such highways are used, and is within the scope of the easement.

But when an easement in land is acquired for a country road or highway, the fee remaining in the abutting owners, and the adjoining territory has not become built up and populous, the laying of the pipes of a water company in the bed of such road, not to supply water to adjoining residences but to connect with pipes at distant points, is an additional servitude, and the company, although authorized by statute to use the highways, cannot impose such additional servitude except after condemnation, or with the consent of abutting owners.

*Decided April 3rd, 1907.*

Appeal from the Circuit Court for Baltimore County (DUNCAN, J.)

The cause was argued before BRISCOE, BOYD, PEARCE, SCHMUCKER, BURKE and ROGERS, JJ.

*William S. Bryau, Jr.,* and *A. deR. Sappington,* for the appellant.

*Osborne I. Yellott,* for the appellees,

BOYD, J., delivered the opinion of the Court.

Two bills in equity were filed against the Baltimore County Water and Electric Company; one by Mr. and Mrs. George A. Dubreuil, and the other by Mr. Douglas H. Gordon, in each of which an injunction was prayed for, to prevent the company from digging a trench or laying its water mains along that portion of Lake avenue which lies within the bounds of the properties owned by the respective plaintiffs. It is admitted that the lines of the deeds of Mrs. Dubreuil and Mr. Gordon extend to the center of Lake avenue, embracing the southerly side thereof, and that the defendant company was digging a trench along that side of the avenue, within those lines, for the purpose of laying one of its water mains. A preliminary injunction was issued in each case, and after the defendant answered, testimony was taken, which by agreement was used in both cases. After hearing, the injunction was made perpetual in each case. A mandatory injunction was also granted, requiring the defendant to remove such mains as were already laid on the properties of the respective plaintiffs, and to refill the trenches, each bill containing a prayer for such mandatory injunction. The cases being similar, they were argued together in this Court, and will be disposed of in one opinion. The company had obtained permission from the Highways Commission of Baltimore County to lay the mains in the bed of Lake avenue from Falls road to Bellona avenue, which included the part of Lake avenue on which these properties fronted, but it had not acquired, by

purchase or condemnation, the interests of the plaintiffs in the bed of that avenue. The principal question, therefore, is whether water mains laid in the bed of Lake avenue, in which the plaintiffs owned the fee at the points involved, constitute an additional servitude.

In the recent case between this company and the County Commissioners of Baltimore county, *et al., ante p.* 154, the question before us was whether or not the Water Company could lay its mains and pipes in the highways of Baltimore county, without first obtaining the consent of the local authorities, and we held it could not, beyond certain territories therein referred to in which they had that power. In discussing the meaning of the expression "to extend its operations," used in an amendment to its charter, by way of illustrating the necessity for obtaining from the State some such-power as that expression conferred, we stated a proposition of law, the correctness of which we do not understand to be questioned, but it is not conclusive of these cases. We there said that it could not be pretended that the Act of 1900, ch. 52, which was the one relied on by the company, gave it power to use *private* property, without the consent of the owners, "and it would seem to be equally clear that neither the Legislature nor the County Commissioners could authorize this or any other water company to use county roads, if the fee belonged to the abutting owners, without their consent." We then referred to some authorities which pointed out the distinction between the right to use streets in cities and towns, for laying gas and water pipes, and that to lay them in what we there spoke of as *"county* highways," but the word *"country"* would have more accurately expressed our meaning, as we did not intend to say that a different rule from that applicable to streets in cities and towns was applied to other highways, simply because they were owned or controlled by the county authorities, instead of by those of some incorporated city or town.

The law is well settled that, although the fee of streets in cities and towns is in the abutting owners, it is subject to the

paramount right of the public for all proper street uses, which include gas and water pipes, sewers, etc. Lights, water and drainage are so essential to the comfort, health, protection and convenience of the people of a city or town, that the original owner is conclusively presumed to have known, and to have consented, that such uses could be made of a street laid out over land formerly owned by him, however it be acquired by the municipality, and those claiming under him have no more rights in the streets than he had. Or, as a late book on municipal corporations expresses it, "Ordinarily the use of streets for such a purpose (supplying water) does not impose any additional burden or servitude, and the adjoining owners, therefore, are not entitled to compensation for such use, it being one of the common and anticipated purposes to which they may be put." 2 *Abbot on Mun. Cor.*, 1165.

But the great weight of authority is to the effect that there is a distinction between the use of streets in cities and towns for gas and water pipes, and the use of country or rural highways. See 14 *Am. & Eng. Ency. of Law*, 921; 30 *Ibid.* 438; 15 *Cyc.* 671; *Ibid.* 683, 2 *Abbot on Mun. Cor.*, 1166; and *Thorton on Oil and Gas*, Sec. 505; where many cases will be found in the notes. In *Mackenzie's Case* 74, Md. 47, the distinction is recognized and reasons given for it. In that case it was said of "an ordinary road or highway in the country," that "all the public acquires is the easement of passage and its incidents," and that is in substance the doctrine announced by most Courts. The appellant, however, contends that if it be conceded that laying gas or water pipes along a strictly country road, for the purpose of conveying gas or water from one distant point to another, and not for the benefit or convenience of the abutting owners, is an additional servitude, still the nature of the locality and the character of the surroundings of Lake avenue are such as authorize the Court to apply the rule applicable to streets in cities and towns, and not that which is applied to country or rural highways, as those terms are used by the Courts. The solicitors for the appellant say in their brief: "There is no magic about a charter.

The question is what are the needs and requirements of the class of property holders whose homes abut upon the highways." We are not inclined to take issue with them as to the effect of a charter or altogether as to the other statement. We can see no reason why the mere fact that a place is or is not incorporated should require the application of the one rule, to the exclusion of the other. It is not a question of incorporation *vel non*, but when highways are dedicated to, or in any way acquired by the public, the real question as to what uses can be made of them must depend largely upon circumstances. It would not be reasonable to hold that the streets of an *incorporated* town can be used for water and gas pipes, and similar uses, without compensating the owners of the fee, while those of a town of the same general character, size, etc., but *not* incorporated, cannot be.

The real question to be determined in such cases is, whether the proposed use of a highway is such as can reasonably be said to be within "the scope of the original easement." After quoting at length from *Western Union Tel. Co.* v. *Rich*, 19 Kan. 517, the Court, in *American Tel. & Tel. Co.* v. *Pearce*, 71 Md. 543, accepted the doctrine of the Kansas case, and said: "It recognizes the right of the land owner to compensation for every additional burden cast upon the land outside the scope of the original easement, and that whether a given structure creates an additional servitude is a *question of fact*, depending on the circumstances of each case, to be determined by the tribunal having jurisdiction to try the same, and before which it is tried." The tribunal whose duty it is to determine the question is not to be governed alone by the mode of user first adopted, or by the conditions existing at the time the highway is acquired by the public. For example, if the easement when acquired be over land which is in the open country, but is so situated that it will probably be built upon, like a street of a city or town, and is afterwards so built upon, it would be wholly unreasonable to hold that the public must again compensate the owner of the fee before it can make such use of the highway as its then condition requires and justifies, provided

of course, they be within the scope of the original easement. Indeed we have many instances in this State of such changed conditions—where the highway when acquired by the public was in the open country, but subsequently became a street of a town. It could not be successfully contended that water and gas pipes could not be laid in such street without additional compensation to the owner of the fee, merely because the land was originally taken for a rural highway. Reference to some of our decisions will show the view this Court has taken as to what is an additional servitude, either on city streets or country highways.

In *Peddicord's case*, 34 Md. 463, it was determined that the use and occupation of the bed of a turnpike for the purposes of a passenger railway was not a new and distinct servitude, entitling an abutting owner to a new compensation for such use of the land. It is true that the railway company was acting under a contract with the turnpike company, which had secured the easement by legislative authority, through purchase or condemnation, but if it had not been an authorized use of the road, the turnpike company could not have granted it to the railroad company, to the detriment of Peddicord. That road was in the country. Then in *Hiss* v. *Railway Co.*, 52 Md. 242, we held that the Legislature had the power to authorize the railway company to construct and use a horse car railway on Decker street, or Maryland avenue, in Baltimore County. In commenting on the distinction made by JUDGE COOLEY between streets taken or dedicated for city or town purposes, and county highways, the Court said that, without determining whether that distinction was supported by authority, it "cannot and ought not to apply in this case; for although the way is not technically within the city limits, its location, in such near proximity thereto, as an entering way into the city and exit therefrom; and in fact, as an extension of one of the city streets it must and ought to be regarded as subject to the same burdens in the way of use which would legitimately fall on the street, of which it is, at the place in question, only an extension. * * * Under such cir-

cumstances it must be supposed the dedicator intended it to be liable to all the uses of city streets, one of which, it was so absolutely certain that, in the growth of the town, it would become." In that case the fee of the bed of the street was in the complainants, who were refused an injunction, although the street was in Baltimore *county* and *not in the city*. In *Hodges* v. *Railway Co.*, 58 Md. 603, an order refusing an injunction to lot owners on Park avenue, in the city of Baltimore, was affirmed, and it was held that the use of a street for a horse railway was not an additional servitude, for which adjoining lot owners could recover compensation. It is there said that "the easement thereby acquired was the right to use the streets of a city, not only according to the then existing modes of travel and transportation, but all such other modes as may arise in the ordinary course of improvement; and that a horse railway is but one of the legitimate contingencies within the objects and purposes for which the street was dedicated to the public, and which, we must therefore presume, was within the contemplation of the parties, at the time damages were assessed to abutting owners." Then in *Koch* v. *Railway Co.*, 75 Md. 222, we extended that doctrine to *electric* railway companies in the streets of Baltimore, on the ground that electricity was but a new and improved motive power for propelling street cars, and in no manner inconsistent with the uses and purposes for which streets were opened and dedicated, as ways for public travel.

Again in *Green* v. *Railway Co.*, 78 Md. 294, we so held as to an electric railway on the turnpike which was before the Court in Peddicord's case. We quoted from the latter case that: "It may be said to have been within the legal contemplation of all, that it (the road) was to be used for all purposes by which the object of its creation, on a public highway, could be promoted." In *Lonaconing Ry. Co.* v. *Con. Coal Co.*, 95 Md. 630, the previous cases were reviewed, and it was distinctly determined that the owner of the fee of a country road was not entitled to an injunction against an electric railway company, because it was not an additional servitude. It

will be observed that we have not distinguished between the
streets of cities or towns and country highways, in determin-
ing whether there was an additional servitude, by reason of
their use for horse or electric railways, but we have been
governed by the fact that such uses, of both streets and rural
highways, were only new modes of travel and transportation,
and the right, originally acquired, to use them was not simply.
for the then existing modes, but for all such as might arise in
the ordinary course of improvement. It could therefore be
presumed that such improved modes of travel and transporta-
tion were within the contemplation of the parties at the time
the damages were assessed to abutting owners.

In *Am. Tel. & Tel. Co.* v. *Pearce*, 71 Md. 535, it was held
that if a telephone or telegraph line be constructed over the
right of way of a railroad company, for its use and benefit in
the operation of its road and to facilitate its business, the land-
owners cannot complain, because such use of the land is
within the scope of the original easement, for which they have
received compensation; but if the line be not constructed for
such purpose, it is a new easement, and puts a new and addi-
tional burden upon the land, for which the owners are en-
titled to compensation. The evidence showed that the line
involved in that case was being built by the appellant as a
link in the chain of its communication, at long distances, by
telegraph and telephone, and not for the railroad company,
and it was therefore clearly a new easement. When the rail-
road company condemned its rights of way it could not have
entered the minds of the parties that the owners were being
compensated for such a use of the land as was then attempted.
Indeed it might as well be claimed that a telegraph or tele-
phone company could condemn a right of way, and give
authority to a railroad company to use it for its tracks, with-
out further compensation to the owners, as to hold that the
railroad company could condemn it and give authority to the
telephone or telegraph company to use it for *its* purposes and
not for those of the railroad company. It was a case of one
public service corporation condemning and paying for land to

be used for its own purposes, and then undertaking to give another public service corporation, engaged in an entirely different business, the right to use the land for its business.

In *Mackenzie's case, supra*, while the Court pointed out the distinction between the two classes of highways, which we approve of and adopt in this case, the suit was concerning a pole on Charles street, in the city of Baltimore, and hence was not decided on the ground that it was on a country highway. Inasmuch as it is shown (74 Md. 51) that the plaintiff was not the owner of the reversion in the bed of Charles street, the question of such an owner's rights was not necessarily involved in the case. So in *Phipps' case*, 66 Md. 319, the record did not show who were the owners of the fee, but it was decided on the ground that the railroad company had acquired from the former owners, and paid for, the land in controversy, although the statement there made, that the use of a highway for a steam railroad is an additional servitude is in accord with the authorities. It is because such use cannot be reasonably said to have been contemplated by the parties, but is a new and different use, and moreover such a railroad to some extent excludes the public at large.

In Mackenzie's case, after speaking of an ordinary road or highway in the country, the Court said: "But with respect to *streets* in populous places the public convenience requires more than the mere right of way over and upon them," and there are other cases using similar expressions. There is nothing in our decisions that indicates that laying gas or water pipes under what was originally a mere rural highway, after it becomes built upon and populous, like an ordinary street in a town, can be said to be "outside the scope of the original easement," any more than building a horse or electric railway would be—in point of fact the abutting owners are not as much interfered with by laying water and gas pipes under the surface of the highway, as they are by the construction of an electric railway, which requires the erection of poles, wires, etc., over the surface, if an overhead trolley is used, or, if an underground trolley be used, requires the surface to be dis-

turbed—indeed in either case there is a disturbance of the soil below the surface of the highway.

But applying these principles to the facts of this case, what must the result be?    The proof shows that the appellant proposes to run its mains northerly on the Falls road to Lake avenue, then eastwardly on Lake avenue to Bellona avenue, and then branching off into two pipes—one northerly to Gittings avenue, and with that avenue eastwardly to connect with the water main on York road, which now supplies water to Govanstown, Towson, Waverly and vicinity, and the other going southerly on Bellona avenue to the York road.    The pipe going northerly on the Falls road is to be connected with one coming from the present system of the company at Catonsville.    The properties of the plaintiffs are on Lake avenue, between Charles street avenue and Roland avenue. Near the corner of Lake avenue and Falls road there are quite a number of houses, most of them on Falls road but ten or twelve on Lake avenue.   It is over a mile from those houses, along Lake avenue to Charles street avenue, and there are only seven houses in that distance, including those of Mrs. Dubreuil and Mr. Gordon, on the south side and eight on the north side.   There are very few between Charles street avenue and Bellona avenue, a distance of about a quarter of a mile. The pictures in evidence of Lake avenue and of the properties fronting on it between Bellona avenue and Falls road, as well as the other testimony, shows that it is simply a country road —doubtless kept in better condition than many other roads owing to the class of houses on the properties fronting on it, but for over a mile there are only fifteen houses on the two sides of Lake avenue, some of which set back a considerable distance.    It can scarcely be claimed under the evidence that the object of laying the mains on Lake avenue was to furnish the houses thereon with water, but it was undoubtedly to use that avenue, for more than a mile, to connect with the pipes at other points, although, of course, the company might be willing to give those living along there the use of water, if

sufficient compensation be made for the connection and supply. The testimony fails to show any demand from those persons.

There is therefore, not sufficient evidence to justify us in holding that Lake avenue, for this distance of over a mile, is so situated or improved that it can properly be treated, for the purposes of the question before us, as a street and not as a country road. The properties were spoken of by one of the witnesses as "gentlemen's country residences, undeveloped property." They vary in size from ten to forty or fifty acres, and most of them are improved by handsome residences which are some distance back from the avenue and have their own water supply. It is true that there are a number of small towns, villages and developments within half a mile, or less, of this avenue, but with the exception of the houses near the corner of Falls road there are very few fronting on it. The property on it has not yet reached that stage of development that can fairly be said to change it from a country highway to such a street or avenue as would justify us in applying to it the rule applicable to streets in cities and towns.

The appellant has a franchise from the Legislature to use the public highways of this locality for laying its mains and pipes, but that cannot give it the right to take property owned by these plaintiffs, without their consent, unless by condemnation. The right of eminent domain is conferred upon it, and in such a location and under such conditions as are shown in these cases it must resort to that, if it deem it desirable to use Lake avenue for its mains. There are places on the plat filed, such for example as that near the corner of Falls road and Lake avenue where houses have been erected in such numbers and in such proximity to each other as would justify the applica-cation of the rule which governs streets in cities and towns, but we think it would be carrying that doctrine beyond what the authorities authorize, to apply it to Lake avenue, along the properties of these plaintiffs, in its present condition.

The decree in each case will therefore be affirmed.

> *Decree in each case (Nos. 65 and 66, Office Docket) affirmed, the appellant to pay the costs.*